## COLONIAL INSURANCE COMPANY, Plaintiff-Appellee, v. GRAW et, Defendants-Appellants.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 23451. Decided October 20, 1955.

496

Rager, Forrester & Schaaf, Cleveland, for plaintiff-appellee.
Stage & Butler, Cleveland, Baker, McKenzie, Hightower and Brainard, for defendants-appellants.

**OPINION**

By SKEEL, J:

This appeal comes to this Court on questions of law from a judgment of the common pleas court of Cuyahoga County, declaring the rights of the plaintiff and defendant under a contract between the plaintiff and the defendant, E A. Graw, dated November 1st, 1950. The plaintiff is a Mutual Protective Association, organized and doing business under the laws of Ohio, with its principal place of business now located in Cleveland.

In 1947, the defendant, Napier, contacted the plaintiff, then known as the Accident and Health Association of Toledo, with a view of assisting its progress. The undoubted purpose of giving help to the plaintiff was to ultimately secure an exclusive sales agency agreement with Colonial Insurance Company. There is some evidence that the defendant gave some financial help during 1947 and 1948 and, in fact, did release two of his employees, Edward A. Graw and David A. Davis, from their work with other Napier insurance enterprises in Chicago, to help build up the insurance business of the plaintiff. Both Davis and Graw at different times thereafter became full-time employees of the plaintiff, Davis, at first employed as its Secretary-Treasurer, and now as its President, and Graw, its Sales Manager and Head of the Claims Department.

The evidence shows that prior to November 1st, 1950, Napier, Davis and Graw talked over securing an agency agreement with the plain-

tiff but the idea was postponed because there was a general feeling between them that the time had not yet arrived to start such a venture and also neither Napier nor Graw had the funds to finance such an agency.

Either with or without the knowledge of Napier (Napier categorically denying such knowledge), a contract was negotiated between the Colonial Insurance Company and Graw under the name of E. A. Graw Agency, whereby the Agency was authorized and granted full supervision of the company's sales organization and the solicitation of business in territories to be mutually agreed upon. It was provided that the agency was to pay all salaries, commissions, rents of sales offices, advertising and other expenses incurred in the acquisition of business. The Agency was to receive as compensation for insurance written (1) the policy fee (2) the first month's premium (3) 40% of the first year's premiums (4) 30% of renewal premiums so long as a policy written by the Agency remains current, even though the agency contract be cancelled or otherwise terminated as provided in the contract (5) the Agency was to receive an additional 10% when the application for a policy was accompanied with the company's share of an annual premium, and 5% additional where such application is accompanied with the company's share of a semi-annual premium and (6) the Agency was to receive a service fee of 2% of the net premiums received by the company for services to policy holders, collecting premiums, giving information, reinstating policies, assisting in claims adjustment and any other services rendered. The agreement provided that it could be terminated by either party upon ninety days written notice. The record discloses the minutes of the meeting of the Board of Directors, held November 17, 1950, at which time the agency contract received Board approval. Whether this meeting of the Board was a regular meeting or a special meeting is not stated nor does the record show that notice of the meeting was given or waived. In all events, the name of the agency was used in soliciting new business after November 1st, 1950 until the latter part of 1952. There is some suggestion in the record that the expenditures of the plaintiff for new business were exceeding the percentage of income for new business allowed by by-laws of the Company and the Agency was a means devised to assume these excessive obligations or expenditures. One thing is clear from the record, and this is, with the exception of a twenty-five hundred dollar investment put into the agency by Graw, the only capital used to operate the business of the Agency was derived from loans or advances from the plaintiff made in violation of §3919.01 R. C., and the percentage of premiums on new business claimed by the Agency under the agreement. Graw, a salaried employee, in charge of sales and claims of the plaintiff, continued as a salaried employee without change in his duties after the agency agreement was signed. An agency account was carried on the company books which showed a continuous deficit of considerable amount during the years 1951 and 1952, at one time reaching a total of $37,500.00 which deficit continued after the use of the agency was discontinued in October of 1952.

After October of 1952, Graw continued to act as Sales Manager and in charge of claims for the plaintiff in the same manner as he had, both

before and during the agency's operation, the expenses involved in carrying on his work being paid out of the funds of the Company almost in the identical manner as when solicitations for new business were made through the name of the agency.

In July 1952, defendant Napier and Graw entered into a partnership agreement to take over the business of the E. A. Graw Agency. On the same day the partnership agreement was executed, a supplemental agreement was signed which recited that Graw had paid into the Graw Agency $14,007.00 and was liable to two banks in the sum of $5,000.00 from which a part of the money advanced had been secured. This agreement provided that Graw was to be reimbursed this amount at the rate of $2,000.00 per month out of agency income before Napier could share in the profits of the partnership. To what extent thereafter Napier benefited by the agency income is not disclosed but on October 2nd, 1953, by written agreement, the partnership was dissolved and the parties contracted to divide the income from renewal premiums claimed to be due the Agency from Colonial Insurance Company after certain debts of the agency were liquidated. This is the agreement by which a portion of renewal premiums were assigned to Napier and forms the basis of his counter-claim in this action.

The agreement is indeed an unusual instrument which attempted to settle for all time claims and counter-claims of the parties arising and resulting from many years of business relationships. It is also the basis for the counter-claim set up by Joseph A. Thiel against Napier after he became a new party defendant. By the agreement, Napier agreed to pay out of funds received from Colonial, attorney fees contracted by Graw. Thiel, as Graw's Attorney, claims there is due him by reason of such promise the sum of $3500.00.

On October 16th, 1953, Graw notified Colonial of the terms of the assignment to Napier and the assignment was accepted by Davis as President of the Company. The Colonial, from the date of acceptance of the assignment, distributed renewal commissions that accrued on business written by the agency as provided by the assignment until January of 1954. During this period, Napier received a sum in excess of $8,000.00.

On October 15, 1954, after this action had been filed, Graw then being a party defendant, entered into an agreement with Colonial which after reciting the agency contract of October 1st, 1950, and the assignment of part of the renewal commission to Napier and the allegations of the petition of Colonial seeking to have the Agency contract declared a nullity and requiring Graw to account for commissions received under the contract, provided for the discharge of Colonial from any and all liability thereafter to either Graw or the Agency from paying commissions or renewal commissions on insurance written by the Agency or any other claims growing out of the agency agreement. This contract also provides that Colonial released any and all claims including any obligation to account that it might have against Graw for premiums received. It was the purpose of this agreement to settle all claims alleged by one against the other in this lawsuit and also to settle all differences between the parties of any kind or nature whatsoever. This contract further provides;

"3. It is understood by the parties that GRAW, by these presents, and particularly by virtue of the releases contained in paragraph 1, does release only his claimed interest under the alleged contract referred to and not any interest to said alleged contract and commissions and renewal commissions purportedly payable thereunder which he has assigned, transferred or set over prior to the date of these presents, particularly any assignment or transfer of interest which he may have made to said L. O. NAPIER.

"4. If GRAW is now, or in the future becomes, entitled to any part of the interest heretofore assigned to L. O. NAPIER by reason of L. O. NAPIER'S breach of contract or for any other reason, GRAW will, and by these presents does release the COMPANY from any claims or demands therefor."

The Commissioner of Insurance on January 25, 1954 directed by letter that Colonial cancel the GRAW Agency contract for the reason that it was "illegal," the letter citing as authority for such claim and demand. **State, ex rel. National Mutual Ins. Co. v. Conn, Supt. of Ins., 115 Oh St 607.** Paragraph 3 of the syllabus provides as follows:

"3. The payment by a mutual insurance company of excessive and exhorbitant salaries to an officer or agent is an unsound practice and a wrong upon the policy holders and members of such company, and it is the right and the duty of the superintendent of insurance to require salaries and compensations of officers and agents to be reasonable, and it is further the right of such superintendent of insurance to require restitution of excessive and exorbitant amounts so paid."

Thereupon, Colonial ceased to pay any further renewal commissions under the terms of the assignment from Graw to Napier above set forth, and this action was filed seeking a declaratory judgment as to the rights of the parties under the agency agreement, the assignment to Napier, the settlement between Graw and Colonial and the conduct of the parties under these agreements.

· The third amended petition and defendant Napier's answer and cross-petition filed thereto and the cross-petition of Thiel, seeking judgment against Napier for attorney fees due him from Graw claiming Napier, as part consideration for the assignment agreement of October 3, 1953, agreed to pay such fees out of money received through such assignment, set forth the issues upon which the case was tried. The third amended petition in substance claims that the alleged agency agreement of November 1st, 1950 was:

a) Illegal, not having been approved by the Board of Directors.

b) Was a sham and a fraud on the policy holders because in its operation it was financed entirely by the funds of the company and was so intended by the parties.

c) Such agency was illusory in character and upon instructions of the Insurance Department of Ohio in October 1952, the use of the agency was abandoned and all insurance thereafter solicited was carried forward in the name of Colonial.

d) That because the way the contract was performed, being financed entirely by plaintiff's funds, there was a total failure of consideration. ·

e) That the whole scheme whereby a sham and illusory agency was created was the result of a conspiracy between Graw and Napier.

f) That because Napier breached the terms of the so-called assignment agreement of October 2nd, 1953, he has lost all right provided for therein.

The answer of defendant Napier denied the claims of the plaintiff and by cross-petition seeks accounting and judgment under the assignment agreement.

Upon trial to the court, no demand being made for a jury, the court found that the agency contract, under which defendant Napier claims as assignee, was legally created but illegally performed and therefore unenforceable and void ab initio and that neither the plaintiff nor Napier acquired any rights thereunder. The court denied plaintiff's claim for accounting for renewal commissions and defendant's counter-claim for payment of renewal commissions under the assignment. The court also granted new defendant, Thiel's cross-petition and entered judgment in his favor against Napier for $3500.00

To the judgment thus entered, this appeal has been taken by the defendant, Napier, claiming the following errors:

"1. The Court erred in the admission of evidence and testimony.

"2. The Court erred in the exclusion of evidence and testimony.

"3. The Court erred in that the judgment of the Court below is contrary to the evidence.

"4. The Court erred in that the judgment of the Court below is not sustained by the evidence.

"5. The Court erred in that the judgment of the Court below is against the weight of the evidence.

"6. The Court erred in that the Court below did not permit to the Defendant-Appellant, L. O. Napier, a trial by jury.

"7. The Court erred in that the judgment of the Court below is based upon issues not raised by the pleadings, upon which no evidence was presented to the Court and which was not before the Court.

"8. The Court erred in that the Court below gave no opportunity to the Defendant-Appellant, L. O. Napier, to present to the Court evidence or argument upon the basis upon which the judgment of the Court below was made.

"9. Other errors apparent upon the face of the record."

The relationship between Davis, Graw and Napier is an important factor in determining the issues in this case. Napier had been the employer of both Davis and Graw for a long period of time. He had assumed to control their destinies; and by promises of reward or threats of economic destruction, had controlled their activities in conducting the affairs of Colonial until the proxy fight in 1953. Davis, in fact, continued in the employ of Napier or one of his Chicago insurance enterprises, that is, he worked in a dual capacity almost two years after becoming secretary and treasurer of Colonial. The agency agreement had been negotiated almost two years before he, Davis, became a full-time employee in carrying out his official duties for Colonial. Davis came to Colonial only after getting a promise from Napier that he, Davis, would be permitted to operate the company without interference from Napier. This request was granted only because Napier's interest in Colonial was to secure from it the exclusive right to sell its insurance protection.

With this background in mind, the circumstances surrounding the creation and operation of the agency agreement must be examined. Neither Napier nor Graw possessed funds sufficient to operate the agency as of the date of its creation. The defendant's claim that Graw would put in the necessary funds at the beginning is not supported by the evidence which is that he said he could raise the necessary money but in fact did not do so. Both Napier and Davis testified to this fact. Before the contract, Graw, as a salaried employee, directed all sales of Colonial and the expenses were paid by Colonial. After the contract was entered into, this procedure was continued without change. Just what possible benefit could be derived by Colonial from the manner in which the contract was performed is impossible of determination. Certainly, it did not receive the full benefit called for by the contract because outside capital was not contributed to its selling program, with the possible exception of the claimed twenty-five hundred dollar investment by Graw.

The trial court found that the contract was void ab initio for illegality in performance by the loan of funds to the agency in violation of §3919.01 R. C. Whether this conclusion can be supported, we are not required to say, but there can be no question that there was a breach of the terms of the contract by the Graw agency resulting in substantial failure of consideration in that after Graw contracted to fully pay the cost of carrying on the agency while the true facts are that the greater part of the money actually used for that purpose was illegally taken out of the funds of Colonial, not only with the knowledge and active participation of Graw but with full knowledge of Napier.

In **9 O. Jur. 324,** the first part of paragraph 101 provides:

"Want of consideration in law means and is a total lack of any valid consideration for the contract. Failure of consideration in law, is just what the plain meaning of the words conveys, that is to say, failure of consideration is the neglect, refusal and failure of one of the contracting parties to do, perform or furnish, after making and entering into the contract, the consideration in substance and in fact agreed upon."

In order for a party to maintain an action for the benefits due him under a contract, he must be able to show substantial performance of his own promises. **Brick Co. v. Machinery Co., 89 Oh St 365.** 12 Amer. Juris, page 927, in dealing with the subject of partial failure of consideration, it says in paragraph 360:

"It does not follow in every case of mutual and dependent promises that upon a failure of one party to perform his promise the other party will be exonerated or excused from performing his promise. Before partial failure of performance of one party will excuse the other from performing his contract or give him a right of rescission, the act failed to be performed must go to the root of the contract."

Certainly the failure to furnish the necessary capital called for in the agency agreement, or perhaps that which would constitute with greater clarity a partial and substantial failure of consideration of such agency agreement, not only to breach the promise to furnish the necessary capital but in addition, to attempt to overcome such breach by

illegally taking the necessary capital from the promisor, certainly such breach would go to the "root of the contract" and would constitute a sufficient basis for a cancellation or rescission of the agency agreement.

The plaintiff corporation, under the facts and relationship of the parties in this action, cannot be estopped from claiming the right of cancellation or rescission of the agency contract (renewal commission provisions of which the defendant Napier is attempting to enforce) because its officers continued to perform the provision of such agreement with full knowledge that the agency was in serious default in financing its operations and where because of such default, the company for a time advanced funds to continue its operation, the reason for permitting such cancellation or rescission being that the company was without legal right to expend its money to sustain the operation of the agency. See Vol. 1, Restatement of the Law of Contracts, Section 274, page 399.

In Corpus Juris Secundum, Vol. 19, page 483, sub-section b., under paragraph 1011:

"To estop the corporation to deny authority or acts of persons assuming to act for it, there must have been some act or conduct on its part, amounting to a representation designed to injure another who, in ignorance of the truth and of his rights, relied on it and was misled to his injury."

Napier was conversant with all of the circumstances of the operations and performance of the agency agreement, including the failure of Graw to provide the financing as called for by the agreement. In fact, he failed to keep his promise to assist in providing the necessary money to operate the agency after January 1951. Under all the facts, the defendant Napier, cannot now claim that the plaintiff is estopped from denying further liability under the agency agreement after part performance with full knowledge of the agency's default.

We must conclude, therefore, that the plaintiff acted within its legal rights in rescinding its promise to pay renewal commissions on the discontinued E. A. Graw Agency Agreement under Graw's assignment of such right to the defendant Napier.

The other claims of error alleged by defendant Napier are overruled.

Just what evidence the introduction or rejection of which is claimed to be prejudicial has not been called to our attention. We need not further consider the claim of insufficient evidence or the issues as presented by the pleadings. These questions have been fully considered. We also hold that the defendant, having failed to demand a jury and proceeding to trial to the court without objection, cannot now claim the failure to afford him a jury trial as error.

From a full and complete consideration of this record, without holding that the contract was void ab initio, we affirm the judgment of the trial court for the reasons above stated.

Exceptions noted. Order see journal.

KOVACHY, PJ, HURD, J, concur.