[Cite as *Bakhshi v. Baarlaer*, 2021-Ohio-13.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| JAY BAKHSHI | : | |
| | : | |
| Plaintiff-Appellant/Cross-Appellee | : | Appellate Case Nos. 28767 and 28768 |
| | : | |
| v. | : | Trial Court Case No. 2017-CV-2917 |
| | : | |
| RICHARD BAARLAER, et al. | : | (Civil Appeal from Common Pleas Court) |
| | : | |
| Defendants-Appellees/Cross-Appellants | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of January, 2021.

. . . . . . . . . .

MICHAEL T. COLUMBUS, Atty. Reg. No. 0076799, 130 West Second Street, Suite 2103, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellant/Cross-Appellee

SCOTT G. OXLEY, Atty. Reg. No. 0039285, 325 North Main Street, Suite 204, Springboro, Ohio 45066
    Attorney for Defendants-Appellees/Cross-Appellants

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** This case involves separate appeals filed by Plaintiff-Appellant/Cross-Appellee Jay Bakhshi and Third-Party Defendant-Appellant/Cross-Appellee Miami Valley Construction Group, LLC, from a trial court judgment filed on February 25, 2020. Defendants-Appellees/Cross-Appellants, Rick Baarlaer and Marick, LLC, also cross-appealed in both appeals.[1] We consolidated the appeals in April 2020.

**{¶ 2}** Jay has submitted one assignment of error directed to the trial court's rejection of his claims based on a promissory note and mortgage that Rick signed. In addition, MVCG has asserted four assignments of error relating to the trial court's findings concerning the construction contract, a quantum meruit claim, and a damages award. Rick and Marick, while filing notices of cross-appeal, have not presented any specific assignments of error; instead, they ask that the trial court judgment be affirmed.

**{¶ 3}** After considering the assignments of error and the record, we find the assignments of error without merit, except for a minor matter regarding computation of damages. Accordingly, the judgment of the trial court will be affirmed in part and reversed in part, and the matter will be remanded for correction of the judgment entry.

## I. Facts and Course of Proceedings

**{¶ 4}** This case arose from a remodeling project for a bar named Mr. Boro's Tavern, which is located in Springboro, Ohio. After selling a taxi-cab business, Rick and his live-in girlfriend, Marci, began looking for property to lease for a bar. Rick had always dreamed of owning a bar, and Marci had been involved in bartending and in owning and

---

[1] For clarity and convenience, we will refer to the parties as "Jay," "MVCG," "Rick," and "Marick."

operating bars for many years.   Transcript of Proceedings ("Tr.") p. 435 and 494.

{¶ 5} To this end, Rick formed Marick in December 2015, and he and Marci then found a property for the bar in Springboro, Ohio, that was the perfect location and size, but would have to be gutted and remodeled.   Tr. 443 and 495.    The concept they were pursuing was that of a friendly neighborhood tavern, which was Marci's area of expertise.  Tr. 442.   Marci had also lived in Springboro for ten years and knew it as a tight, close-knit community.   She had also researched Springboro's demographics, which revealed that the city had around 18,000 residents, a higher median income, and no neighborhood tavern.   *Id.*

{¶ 6} After signing a lease in late December 2015, Rick hired an architect, Rob Fields, to provide an expert opinion on the remodeling needed to fit the theme and to make preliminary drawings to be used for bidding with general contractors.   Tr. 495-496.  Fields prepared drawings in about two weeks and then contracted some general contractors to provide bids.   One backed out because the scope was too big, one was unreasonably priced, and another wanted the job but could not start until May or June 2016 due to the timing of other jobs.   Tr. 496.

{¶ 7} Someone in the neighborhood was a former employee or salesman for Jay and suggested that Rick contact him.   Tr. 497.   At the time, Jay was the sole owner of MVCG.   The first meeting occurred around March 25, 2016, at the proposed location of Mr. Boro's.   Jay brought Mike Kennedy (the eventual project foreman), Mitch Perry (an interior designer), and Demetrice Minnifield (an electrician) to the meeting.   Tr. 27, 106, 229, and 498.   According to Jay, Rick was in a hurry to start right away.   Tr. 27.

{¶ 8} Rick showed Jay the preliminary drawings and the concept for the bar.   Tr.

499.   Based on the preliminary drawings, Jay gave Rick an estimated price from MVCG of about $156,995 on April 7, 2016.   Tr. 500-501.   After Jay gave the drawings to his architect, Jeanne Cabral, she said they were insufficient for a permit and would have to be redone.   Tr. 503.   Consequently, on May 11, 2016, Rick gave MVCG a $6,000 check for payment of Cabral's architect fees and Perry's design fees.   Tr. p, 504.   At that time, Jay promised that Cabral would provide a workable set of plans within three to four weeks.   Tr. 504 and 511.

{¶ 9} About a week after Rick gave Jay the $6,000 check, Rick and Jay met with Rick's landlord, Scott Duro.   Duro was concerned that nothing had been happening and wanted to meet with Rick's contractor.   Tr. 511.   Jay told Duro and Rick that the drawings would be done in three to four weeks, and that he would then need 11 to 12 weeks to complete the project.   Under this projection, the project would have been done by September 2016.   Tr. 512.   Based on Jay's comments, Duro gave Rick a rent reprieve for June, July, and August, with rent to resume in September.   Tr. 513.

{¶ 10} During the summer of 2016, Marci and Rick met with Jay a number of times. Among other things, they discussed the timeframe, which was "huge" for them because there was a small window before fall and the holidays.   Tr. 445.   They thought a September opening was perfect, because that would give them October, November, and December, during the football season and the holidays, when a lot of restaurants and bars, especially neighborhood bars like theirs, really got business going.   Tr. 445-446. Jay's response to opening in early September was that he could get it done.   Tr. 446. During the meetings, Rick conveyed a sense of urgency to get the project moving.   Tr. 511.

{¶ 11} Cabral did not provide plans until late July 2016, and the plans then were taken to the authorities for approval. Tr. 504 and 513. On July 30, 2016, Rick gave Jay a check for $36,000, before a written contract had been signed. However, Rick did this to facilitate the project while the plans were being approved, as demolition did not need approval and could be started. Jay was also going on vacation and wanted money to pay his demolition people. Tr. 514. On August 2, 2016, Rick wrote another check for $22,000 to MVCG, for supplies and to hire subcontractors and get them ready to move after permit approval. Tr. 514-515. Thus, even before the contract was signed, Rick had given Jay $58,000.

{¶ 12} By the end of August, the ceiling grids were demolished, a humidor was removed, and walls were torn down. Tr. 506. To save money, Rick performed some tasks himself and paid directly for other tasks and supplies. While Jay was on vacation, Rick demolished the tile floor, which had to be removed to proceed with demolition and construction. He finished that by the Friday before Labor Day, except for a few piles of tiles that could not fit in the dumpster Jay had provided. Tr. 506.

{¶ 13} By the time Jay returned from vacation, the health department had approved the plan with one minor change and had sent the plans to the plumbing department, which was in the same building. Rick kept asking Jay if he had heard anything and Jay kept saying no. Eventually, Rick learned that the flow of the hot water heater needed to improve and that the plans would not be released until a licensed plumber came to pick up the plans. However, Jay did not have a licensed plumber, although he had earlier said he had one. Tr. 515-516.

{¶ 14} No work was done between September 2 and September 9, 2016. On

September 9, 2016, Rick entered into a contract with MVCG, for a price of $193,805.41 and an estimated completion date of October 17, 2016. Tr. 509-510 and Joint Ex. III, p. 1. The contract was signed by Rick as owner of Marick and by Jay as President of MVCG. Joint Ex. III at p. 5. At the same time, Rick signed a cognovit promissory note and security agreement, agreeing to pay Jay $40,000 for "value received." Joint Ex. 1, p. 1. Monthly payments of $1,809.09 were to be made on the note beginning January 1, 2017, and continuing for 23 more months. *Id.* The note also had a provision allowing Rick to defer the initial payment for up to four months by paying $350 per month. *Id.* In addition, Rick executed a mortgage, giving Jay a mortgage on Rick's personal residence in Centerville, Ohio, as security for payment of the note. Tr. 42 and Joint Ex. II.

{¶ 15} Jay never paid Rick or Marick $40,000, nor was their contractual liability with MVCG ever decreased by $40,000. According to Jay, his intent in obtaining the note was to protect himself "personally," and it was not a construction loan. Tr. 37. Jay testified that Rick's understanding was that Jay was giving money to MVCG so it would have "working capital" to get the job done. Tr. 343-344.

{¶ 16} As to where this was stated in the document, Jay stated: "That is what was done. That was what was understood. That's what was known. He [Rick] knew that – he knew that even when we discussed it, he wasn't going to get $40,000 from me in turn to just give it right back to my company. He knew I was going to give it to my company as working capital on his behalf to execute the contract. Without it, we wouldn't have executed the contract." Tr. 344. At trial, Jay defined "working capital" as "money that's needed to do the work and finance the actual work that's being done." Tr. 344.

{¶ 17} Rick's testimony concerning the note differed. He stated that the $40,000

represented the final payment on the contract, which was basically overhead and profit. Rick was to provide money up front and also on 75% completion of the project, in order to provide Jay's working capital, or what Jay was going to use to pay subcontractors. There would be a final payment though the promissory note, such that Jay would get his profit; Rick would then make payment on the note for the next two years. Tr. 517 and 616. Payment was to start in January 2017 because, by that time (based on the anticipated completion date), Rick would have operated the bar for a few months and would have capital. Tr. 559 and 615. Additionally, Rick had the option, as noted, to defer the initial payment for several months by paying a fee. Tr. 615.

{¶ 18} On September 9, 2016, Rick wrote a check to MVCG for another $33,852.71. Tr. 516. Consequently, by the time the contract was signed, Rick had already paid $91,852.71, or nearly half of the original contract price.[2] The project was not complete by October 17, 2016, however. As a result, on November 8, 2016, the parties signed a change order which included money for architectural and engineering drawings and the increased size of the water heater. These changes were necessitated because Warren County insisted on certain plumbing changes to push hot water throughout the building. Tr. 519-521, and Joint Ex. V. The contract price increased by a little over $4,600, resulting in a total contract price of $198,478.25. Tr. 109, 203, and 521; Joint Ex. V.

{¶ 19} When the change order was signed, Jay continued to assure Rick that he would be able to complete the project by December 8, 2016, which was the date listed for completion in the change order. Tr. 521 and Joint Ex. V. At that time, among things

---

[2] The actual percentage was around 47.4%.

that still needed to be done were: framing, sanding, drywalling, final electricity, rough plumbing in the floor, new plumbing going to the kitchen and to the bar area, and new rough electric for walls that were moved and recreated.   Tr. 522 and 524.

{¶ 20} On November 16, 2016, Rick wrote MVCG a check for $30,000.   This was based on a text he received from Jay the week before, stating that he should be prepared to write a check for more than $28,000 in order to reach the 75% completion amount.   At that time, Jay said that the project would be 75% complete.   Rick knew that was not the case, but wrote the check in order to keep the project moving.   Tr. 518.   This brought the total amount paid to $121,852.71, or about 63% of the original contract price (and around 61% of the increased price).

{¶ 21} The project was not completed by December 8, 2016.   In fact, substantial work remained to be done.   For example, Jay's subcontractors did not even finish putting up drywall until just before Christmas.   Tr. 540-541.   In addition, 30 to 40 fire-retardant panels going throughout the kitchen were not installed until around December 23, 2016. Tr. 542-543.     Rick paid Jay another $20,125 on December 23, 2016, making $147,977.71, or almost 75% of the increased contract price having been paid directly at that point.   Tr. 82, 220-222, and 545.   Moreover, Rick also purchased $11,737.30 of products, for which he was to receive credit towards the contract price.   Tr. 122 and 594. These payments and purchases totaled $159,715.01, or more than 80% of the increased contract price.

{¶ 22} During January and February, work continued on the project.   Tr. 118-121, 232, 546, and 548.[3]   A soft opening was held for family and friends on March 11, and

---

[3] In an email dated March 7, 2017, Jay sent Rick a notice stating that construction had

another was held on March 12 for community businesses and realtors. Finally, the business opened to the community on March 14, 2017. Tr. 490-491.

{¶ 23} Previously, in February 2017, Jay reached out to his sister, Shawna, about the project. Tr. 137, 388, and 555. Shawna was a marketing and business consultant who owned a restaurant in Alabama. Tr. 384. Between the beginning of March and around March 14, 2017, Shawna discussed the menu and some drink items with Marci. Neither Rick nor Marci contacted Shawna to ask for assistance, and there was no contract for her services. However, they did speak with Shawna on a few occasions. Tr. 471-472, 475, 476, 556, 558. On March 14, 2017, Shawna sent Jay an invoice for $6,500 (based on a half-price "friends and family" rate of $125 per hour). Tr. 154. According to Jay, he was expected to pay this invoice, and ultimately, Rick and Marci were to pay it. Tr. 156-157.

{¶ 24} As indicated, payments on the note were supposed to start in January 2017. However, Jay indicated that he would give Rick leeway because the bar was not yet open. Tr. 552 and 615. Nonetheless, on March 1, 2017, Jay sent a text to Rick stating that "I'm going to exercise my legal options at this point. You are in default of our agreement and in breach of our contracts, and I'm going to turn over all documentations to my attorneys tomorrow and decide which direction I'm going to go." Tr. 611.

{¶ 25} On March 2, 2017, Jay met with Rick and Marci at Mr. Boro's to discuss the

---

been completed on February 6, 2017. Tr. 122 and 13. However, Rick indicated that the partitions for the bathroom did not arrive until February 14, 2017 and took about four days for Jay to install. Tr. 548-549. According to Rick, the job was done on February 28, 2017. Tr. 122, 551, and 562. The evidence indicates that the fire department inspection on the project took place on February 22, 2017, and the health inspection occurred on February 28, 2017. Tr. 611 and 632.

final invoice, because changes were made after the November 8 change order. These changes were not in writing. Tr. 83, 210-211 and 612. At that time, Jay showed up with an invoice totaling $210,970.70, which had no deduction for the $40,000 promissory note and also did not credit the $30,000 payment Rick made in November 2016. Tr. 83, 123, 168, 203, and 612. *See also* Joint Ex. VII (generated by Jay after the meeting).

{¶ 26} Jay attended the soft opening, but things were becoming heated about completion of the payment issue and the promissory note. Jay was also approaching Rick with the idea that one option to make things "right" would be to give Jay a limited partnership. Tr. 652. However, that was never Rick's intention and he felt like he was being coerced. *Id.* The soft opening was the last time Rick and Marci had anything to do with Jay. *Id.*

{¶ 27} On March 15, 2017, Rick's attorney sent Jay a check for $1,050 to delay payment of the promissory note for three months. Tr. 49, and Plaintiff's Ex. 1 and 2. Another check was sent on April 1, 2017, to delay payment for another month. Tr. 51-53, and Plaintiff's Ex. 3 and 4. Jay cashed those checks. Tr. 587-588. In May 2017, Rick sent Jay the first two installments on the note, but Jay did not cash those checks (which were dated after May 1, 2017) and later returned them. Tr. 489-490.

{¶ 28} Shortly thereafter, on June 22, 2017, Jay filed a complaint for money damages and foreclosure against Rick and Marick.[4] Rick and Marick filed an answer and counterclaim on July 21, 2017, raising various defenses, including fraud, fraud in the inducement, lack of consideration, and unclean hands. The counterclaims further

---

[4] Other defendants like the Montgomery County Treasurer were also included, but are irrelevant, because they were dismissed or disclaimed any interest in the real property involved in the foreclosure.

alleged that Jay had failed to provide any consideration for the note and that, due to his actions, the note was void or voidable ab initio.

{¶ 29} Rick and Marick also filed a third-party complaint against MVCG, alleging that it had breached the construction contract by failing to complete the work in a timely manner. They also alleged fraud on the part of both Jay and MVCG. On August 24, 2017, MVCG filed an answer to the third-party complaint and included a counterclaim against Rick and Marick for breach of contract, fraud, and unjust enrichment. MVCG also included claims of breach of contract and unjust enrichment on behalf of Shawna's company ("Grit Marketing"), which had assigned its claims to MVCG.

{¶ 30} After Rick and Marick filed an answer to the third-party counterclaims, the court referred the case to a magistrate in September 2017. The case was then sent mediation, which was unsuccessful and terminated in November 2017. Jay filed a motion for summary judgment in February 2018, contending that the $40,000 promissory note had nothing to do with MVCG, and that he was entitled to judgment on the note and to foreclose.

{¶ 31} MVCG also filed a motion for summary judgment in February 2018, which was supported by Jay's affidavit. According to the affidavit, the construction contract was complete, and Rick and Marick owed MVCG $62,927.99 plus interest and attorney fees. In May 2018, Rick and Marick filed a motion for summary judgment against both Jay and MVCG, contending that the promissory note was void because Jay never paid any money to Jay and did not credit the note's amount against the construction contract. In addition, they claimed that MVCG had breached the contract.

{¶ 32} In July 2018, the magistrate issued a decision finding that the note and

mortgage were void and unenforceable due to lack of consideration. The magistrate further found that MVCG had breached the contract by failing to substantially complete the contract by December 8, 2016. Due to material issues of fact concerning the amount due under the contract, the magistrate denied the summary judgment motions of MVCG, Rick, and Marick.

{¶ 33} After Jay and MVCG objected to the magistrate's decision, the trial court sustained the objections in part. The court concluded that a distinction existed between failure of consideration and want of consideration, and that factual issues precluded summary judgment. Additionally, the court stated that factual issues existed as to the reason for the delay in performing the contract. The court, therefore, set a date for trial to the bench.

{¶ 34} The trial court then held a bench trial, during which it heard testimony from Jay, Marci, Rick, Shawna, Demetrius Minnifield (Jay's electrician), and Scott Hull (Mr. Boro's accountant). Following the trial, the court filed a judgment entry on February 25, 2020, finding in favor of Rick and Marick on any claims for breach of contract by Jay or MVCG, and finding in favor of MVCG on claims for unjust enrichment (based on work performed outside the written construction contract and the change order). The court also found against the parties on all remaining claims in the complaint, the counterclaim to the complaint, the third-party complaint, and the third-party counterclaim. *See* Verdict and Judgment Entry ("Judgment"), p. 1. After deducting the amount of Rick's damages from what he owed MVCG for work performed outside the contract, the court granted judgment in Jay and MVCG's favor in the amount of $21,875.33.

{¶ 35} Jay filed a notice of appeal on March 26, 2020, and the appeal was assigned

Case No. 28767.   MVCG also appealed on the same day, and its appeal was assigned Case No. 28768.    Finally, Rick and Marick filed cross-notices of appeal in both cases. For ease of discussion, we will first consider Jay's assignments of error and will then consider MVCG's assignments of error.

## II.   Jay's Assignment of Error

{¶ 36} Jay's sole assignment of error states that:

The Trial Court Erred by Not Granting Judgment on the Cognovit Promissory Note and Security Agreement and Mortgage, and by Deciding the Contractor's Services and Materials Agreement, Cognovit Promissory Note and Security Agreement, and Mortgage Constituted the Original Contract.

{¶ 37} Under this assignment of error, Jay contends that the trial court erred in construing the contracts together because the contracts do not refer to each other and are not ambiguous.   According to Jay, the purpose of the note and mortgage were to protect himself personally if the construction contract "went sideways."   Jay further contends that he incurred a substantial detriment by loaning money so the project could go forward.    The trial court disagreed, finding that the promissory note and the mortgage were "nothing more" than devices that in part financed the transaction.   Judgment at p. 2, fn. 4.    Although the trial court did not make a specific finding on this point, implicit in the court's decision is that there was a failure of consideration because Jay never paid Rick anything in relation to the promissory note, nor did he credit Marick or Rick with any amount in connection with the construction contract.

{¶ 38} When appellate courts review judgments following bench trials, a presumption applies that the trial court's findings are correct. *Fed. Ins. Co. v. Fredericks*, 2015-Ohio-694, 29 N.E.3d 313, ¶ 21 (2d Dist.), citing *State ex rel. Petro v. Gold*, 166 Ohio App.3d 371, 2006-Ohio-943, 850 N.E.2d 1218, ¶ 81 (10th Dist.). As a result, appellate courts may not substitute their judgment for that of trial courts and must affirm judgments that are "supported by some competent, credible evidence going to the essential elements of the case." *Gold* at ¶ 81, citing *Reilley v. Richards*, 69 Ohio St.3d 352, 632 N.E.2d 507 (1994), and *Koch v. Ohio Dept. of Nat. Resources*, 95 Ohio App.3d 193, 642 N.E.2d 27 (10th Dist.1994). As to questions of law like contract interpretation, our review is de novo. *PNC Bank, N.A. v. Springboro Med. Arts, Inc.*, 2015-Ohio-3386, 41 N.E.3d 145, ¶ 15 (2d Dist.).

{¶ 39} Appellate courts are also "mindful that in a bench trial, 'the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Emswiler v. Bodey*, 2d Dist. Champaign No. 2012-CA-3, 2012-Ohio-5533, ¶ 44, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Consequently, " '[i]f the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " *Seasons Coal Co.* at 80, fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978). *Accord Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21; *Emswiler* at ¶ 44.

{¶ 40} Consistent with this focus on credibility, the trial court made a specific

finding after listing the witnesses who had testified at trial; it stated that it "**expressly finds Messrs. Baarlaer and Hull and Ms. [Marci] Johannes credible in every material respect**," suggesting that the court did not find Jay or his witnesses credible.   (Emphasis sic.)   Judgment at p. 2, fn. 3.

**{¶ 41}** After reviewing the record, we find that competent, credible evidence and legally appropriate analysis support the trial court's verdict on the promissory note.   As a preliminary point, we note that while the note in question was labeled as a "cognovit promissory note and security agreement" and contains the language mandated by R.C. 2323.13(D), it does not contain a warrant of attorney.   *E.g., Klosterman v. Turnkey-Ohio, L.L.C.,* 182 Ohio App.3d 515, 2009-Ohio-2508, 913 N.E.2d 993, ¶ 24 (10th Dist.); *Sutton Bank v. Progressive Polymers, L.L.C.,* Ohio Slip Opinion No. 2020-Ohio-5101, __ N.E.3d __, ¶ 12.   *Compare BJ Bldg. Co. v. LBJ Linden Co.,* 2d Dist. Montgomery No. 21005, 2005-Ohio-6825, ¶ 3 (indicating content of warrant of attorney in cognovit note found to be enforceable).   Jay also did not seek cognovit relief in his complaint or at any point in the trial court.   *See Chattree v. Chattree,* 8th Dist. Cuyahoga No. 95051, 2011-Ohio-1925, ¶ 18.   We, therefore, will consider this matter based on traditional principles that apply to promissory notes rather than considering the note as a cognovit note.

**{¶ 42}** Notably, promissory notes are contracts, and their interpretation is governed by rules of contract interpretation.   *PHH Mtge. Corp. v. Ramsey,* 2014-Ohio-3519, 17 N.E.3d 629, ¶ 33 (10th Dist.), citing *Cranberry Fin., L.L.C. v. S & V Partnership,* 186 Ohio App.3d 275, 2010-Ohio-464, 927 N.E.2d 623, ¶ 9 (6th Dist.). (Other citations omitted.)

**{¶ 43}** " 'A contract is generally defined as a promise, or a set of promises,

actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.' " *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976).

{¶ 44} In the case before us, the dispute concerns consideration for the note. " 'Consideration for a contract can only be that which the parties intended to be the consideration.' " *Busch Bros. Elevator Co. v. Unit Bldg. Servs.*, 190 Ohio App.3d 413, 2010-Ohio-5320, 942 N.E.2d 404, ¶ 7 (1st Dist.), quoting *Borgerding v. Ginocchio,* 69 Ohio App. 231, 237, 43 N.E.2d 308 (1st Dist. 1942). "Consideration, meaning that which is bargained for and given in exchange for a promise, is a necessary element of a binding contract, and the absence of consideration precludes the formation of a valid contract." *Harvest Land Co-Op, Inc. v. Hora*, 2d Dist. Montgomery No. 25068, 2012-Ohio-5915, ¶ 14, citing 17 Ohio Jurisprudence 3d, Contracts, Section 39. "The consideration for a contract need not necessarily be recited or expressed in writing; instead, the consideration may be proved by parol evidence or may be inferred from the terms and obvious import of the contract." *Id.* at Section 40.

{¶ 45} "A party may defend against having to pay under a promissory note by arguing failure or want of consideration for the note." *Santomieri v. Mangen*, 2018-Ohio-1443, 111 N.E.3d 483, ¶ 13 (3d Dist.). A want of consideration differs from a failure of consideration. "Want of consideration is a total lack of any valid consideration for the contract. Failure of consideration is the neglect, refusal and failure of one of the contracting parties to do, perform or furnish, after making and entering into the contract,

the consideration in substance and in fact agreed upon." *John P. Timmerman Co. v. Hare*, 3d Dist. Allen No. 1-03-14, 2003-Ohio-4622, ¶ 10, citing *Colonial Ins. Co. v. Graw*, 102 Ohio App. 430, 438, 129 N.E.2d 491 (8th Dist. 1955).

{¶ 46} Under the law, the existence of consideration for promissory notes is presumed. "[T]his presumption continues until it is shown that there was none; and the burden of showing this is on the party attacking the note for want of consideration." (Citations omitted.) *Santomieri* at ¶ 16, citing *Dalrymple v. Wyker*, 60 Ohio St. 108, 53 N.E. 713 (1899). The burden of proving either failure of consideration or want of consideration is on the party asserting it. *Ohio Loan & Discount Co. v. Tyarks*, 173 Ohio St. 564, 568, 184 N.E.2d 374 (1962).

{¶ 47} In the case before us, the consideration is not apparent from the note; it only says that Rick agreed to repay $40,000 to Jay in installments beginning in January 2017 "for value received." Joint Ex. I. Because the parties had no relationship other than the intended construction project, the obligation's meaning was ambiguous and the trial court correctly concluded that the note was intertwined with the other documents that were signed the same day.

{¶ 48} "Under established law, a promissory note 'may be modified or affected by another writing executed as part of the same transaction.' " *England v. O'Flynn*, 2d Dist. Montgomery No. 18952, 2002 WL 27314, *9 (Jan. 11, 2002), quoting *Edward A. Kemmler Memorial Found. v. 691/733 East Dublin Granville Road Co.*, 62 Ohio St.3d 494, 499, 584 N.E.2d 695 (1992). " 'This follows from the general contract principle * * * that writings executed as part of the same transaction should be read together.' " *Id*.

{¶ 49} By way of comparison, the promissory note in *Harvest Land* "memorialized

a delinquent debt" that the maker (a farmer) had owed an agricultural cooperative. *Harvest Land*, 2d Dist. Montgomery No. 25068, 2012-Ohio-5915, at ¶ 2-3. Here, there was no such relationship and no apparent reason for the note to have been signed, other than in connection with the construction contract.

**{¶ 50}** As indicated, Jay's story was that he charged Rick $40,000 to "execute" the construction contract and to provide "working capital" for MVCG. However, by the time the note was signed, Rick had already paid almost 50% of the contract price. Furthermore, Jay never offered any evidence at trial to substantiate what his own expenses were at any time during the project. In fact, when questioned about the project, Jay testified that he did not have a construction schedule when the contract was signed and had not yet signed any subcontractors. Tr. 286. He also could not say how much he had paid subcontractors by the time more than $91,000 had been paid by November 8, 2016, or when more than $127,000 had been paid on November 16, 2018. Jay also testified that he could not state the total amount he paid to subcontractors without looking at the documentation (even though he was testifying at trial, when he presumably would have brought documents, if they existed). Tr. 289, 290, 294, and 320-321. However, Jay did not offer any such documentation at trial.

**{¶ 51}** Jay claimed that he had deposited $40,000 into MVCG after the contract was signed. He purportedly accomplished this by borrowing money from his father and brother, and by having MVCG sign promissory notes to himself and his brother. In these notes, MVCG promised to pay back $40,950 (more than was deposited).

**{¶ 52}** In addition, Jay signed promissory notes of his own to his father and brother, apparently for the money that Jay had deposited. However, Jay's testimony about these

matters outlined a series of inconsistent and convoluted transactions that did not add up and did not have dates that corresponded with each other. *See* Tr. 44-49, 58, and 62-65, and Plaintiff's Ex. 9 and 10. Jay attempted to explain the discrepancies by indicating that he often borrowed money from his father and brother. Later, he would go back and reconcile how much they lent him, and sign promissory notes. Tr. 65. Jay's testimony was so convoluted, however, that, in the midst of this discussion, his lawyer said, "We will forego the notes." Tr. 68.

{¶ 53} As indicated, the trial court did not find Jay's testimony credible. The court's view is well-supported by the evidence. In this vein, we also note that during the contract period, MVCG paid many, many thousands of dollars to various gambling establishments. As just one example, between September 12 and 14, 2016 (or right after the contract was signed), MVCG's Huntington Bank account showed $31,517 being spent on gambling transactions that were unrelated to the business. Tr. 310 and Defendant's Ex. O, MVCG442-445. According to Jay, his cousin, Katy, had access to the MVCG accounts and was stealing from him to gamble. Tr. 306.

{¶ 54} Although this went on for many months, and even before the contract was signed, Jay claimed that he did not really look at his accounts and was apparently unaware of what was going on. Tr. 307. Jay also did not fire Katy even though she had allegedly defrauded MVCG of many thousands of dollars. Instead, she left in February 2018 based on a medical issue. Tr. 304 and 310. The trial court correctly could have viewed Jay's financial accounting as less than credible.

{¶ 55} As indicated, the trial court did not find Jay credible, and it found Rick credible on all material issues. We agree. The fact is that Jay failed to provide any

value for the promissory note and failed to either give Rick or Marick $40,000 or to credit that amount against the final construction price, which had ballooned to more than $210,000. Instead, when Rick and Jay met after contract completion to discuss the contract overages, Jay presented Rick with an invoice that did not credit him with any amount attributable to the promissory note, and in fact, showed Rick as owing $30,000 that Rick had paid. Tr. 290-291, 517, 552-553, 563-564, 596, 605, and 612. Because there was a failure of consideration, Jay's sole assignment of error is overruled.

{¶ 56} Having resolved the issue of the promissory note and mortgage, we turn to consideration of MVCG's assignments of error, the first of which relates to the finding that MVCG breached the construction contract.

### III. Breach of the Construction Contract

{¶ 57} MVCG's First Assignment of Error states that:

> The Trial Court Erred by Finding Miami Valley Construction Group,
>
> LLC Breached the Terms of the Construction Contract.

{¶ 58} Under this assignment of error, MVCG argues that it did not breach the contract because it had substantially completed its obligations by December 8, 2016, despite delay that Rick and Marick caused at the beginning of the project. As support for this claim of delay, MVCG articulates various items that Rick failed to do or did in an untimely manner, ranging from plumbing, floor demolition, painting, and installation of cabinetry and tile. In addition, MVCG also points to items outside the original scope of work that it was asked to do. *See* Merit Brief [of] Appellant/Cross-Appellee Miami Valley Construction Group, Inc., p. 4-8. The items cited in the brief were taken from Jay's trial

testimony.

{¶ 59} After considering the evidence, the trial court concluded that "finger-pointing" about initial delays was irrelevant, because the parties agreed to extend the date for substantial completion until December 8, 2016, and increased the contract price. Judgment at p. 2. The court then observed that the parties clearly understood that Rick was "desperate to open Mr. Boro's by the looming holiday season, * * * a time of year when neighborhood bars typically flourish." Tr. 3. The court then stated that:

> But Bakhshi/MVCG failed to substantially complete the work owing entirely to Bakhshi's cavalier and reckless failure to do so, thereby violating the contract's express provisions, including Paragraph VIII of Joint Ex. III – the Contractor's Services and Materials Agreement.

Judgment at p. 3.

{¶ 60} Again, because the trial court held a bench trial, we review the court's factual findings to see if they are "supported by some competent, credible evidence going to the essential elements of the case." *Gold*, 166 Ohio App.3d 371, 2006-Ohio-943, 850 N.E.2d 1218, at ¶ 81. We also review contract interpretation de novo. *PNC Bank, N.A.*, 2015-Ohio-3386, 41 N.E.3d 145, at ¶ 15.

{¶ 61} "The elements of a breach of contract claim are 'the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.' " *Becker v. Direct Energy, LP*, 2018-Ohio-4134, 112 N.E.3d 978, ¶ 38 (2d Dist.), quoting *Doner v. Snapp*, 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (2d Dist.1994). Nonetheless, " 'a breach of one of several terms in a contract does not discharge the obligations of the parties to the contract, unless performance of that term is essential to

the purpose of the agreement * * *.' "  *Id.*, quoting *Hansel v. Creative Concrete & Masonry Constr. Co.*, 148 Ohio App.3d 53, 772 N.E.2d 138, ¶ 11 (10th Dist.).

{¶ 62} The fact that time was of the essence in this contract was quite obvious. From the beginning, in April 2016, when Marci and Rick first met with Jay, they told him that the timeframe was huge, due to the football and holiday season.  Tr. 445.  Jay assured them that the project would only take 8 to 12 weeks and that he could get the bar open in early September.  Tr. 445 and 279.

{¶ 63} As noted above, both Jay and Rick also met with Rick's landlord, who was pressing about opening.  Based on Jay's assurances, the landlord gave Rick a rent reprieve for three months, with rent to resume in September.  Tr. 511-513 and 599-600. Delays then occurred during the summer, including the long wait for Jay's architect, and Marci and Rick continued to stress the necessity of getting the bar open.  Tr. 453. 510, and 599-600.

{¶ 64} When the construction contract was signed, Jay promised he would complete the project by October 17, 2016, and that was the date used in the contract for estimated completion.  Tr. 456 and 280, and Joint Ex. III, p. 1.  Between then and October 17, 2016, Marci and Rick continued to stress to Jay the importance of opening the bar on time, and they received reassurances that it would happen.  Tr. 456-457 and 519.

{¶ 65} In its brief, MVCG contends that the only evidence of the fact that time was of the essence came from the "self-serving testimony" of Rick and Marci.  MVCG Brief at p. 10.  However, the trial court explicitly found these witnesses credible.  In addition, at trial, Rick provided text messages to Jay supporting his testimony.  *See* Tr. 599-606.

{¶ 66} Between September 9 and October 17, 2016, further delays occurred. As the trial court stressed, the reasons are not particularly pertinent, because the parties agreed to a change order on November 8, 2016. Tr. 109 and 521, and Joint Ex. V. At that time, Jay assured Rick that he would be able to complete the project by December 8, 2016. Tr. 521. Jay himself testified that when he signed the change order, the understanding was that he would be substantially completed with his work on that date. Tr. 288.

{¶ 67} According to the original agreement, "All change orders need to be agreed upon in writing, including cost, approximate dates when the work will begin and be completed, * * * and signed by both parties. * * * Additional time needed to complete change orders shall be taken into consideration in the project completion date." Joint Ex. III, Section VIII, p. 3. The change order itself stated that "Date of substantial completion for this Change Order shall be December 8, 2016." Joint Ex. V, p. 1.

{¶ 68} "Whether a party has substantially performed under the terms of a contract is a question of fact." *Steen Elec. v. Homes of Elegance, Inc.*, 9th Dist. Summit No. 21876, 2004-Ohio-6275, ¶ 9. The contract itself did not define substantial completion. However, this term has been statutorily defined in the context of the statute of limitations for suing on improvements to real property as "the date the improvement to real property is first used by the owner or tenant of the real property or when the real property is first available for use after having the improvement completed in accordance with the contract or agreement covering the improvement, including any agreed changes to the contract or agreement, whichever occurs first." R.C. 2305.131(G).

{¶ 69} Courts have also interpreted "substantial performance of a contract" to

mean that "mere nominal, trifling, or technical departures are not sufficient to break a contract, and that slight departures, omissions and inadvertences should be disregarded." *Kichler's, Inc. v. Persinger*, 24 Ohio App.2d 124, 126, 265 N.E.2d 319 (1st Dist.1970), citing *Ashley v. Henahan*, 56 Ohio St. 559, 47 N.E. 573 (1897). "A party fails to substantially perform when its omissions are material to the essential duties it promised to perform." *Cad Cam, Inc. v. Adept Mfg. Corp.*, 2d Dist. Montgomery No. 17687, 1999 WL 961374, *1 (June 25, 1999).

{¶ 70} After reviewing the evidence, we find no question about the fact that MVCG failed to substantially complete the project by December 8, 2018. As indicated in the Statement of Facts, above, the drywall and fire-retardant panels were not even installed or completed until just before Christmas. Tr. 540-543. Further, only the rough electrical and rough plumbing were done by December 8, 2016. Tr. 110-111. The final inspection for the electrical work also did not occur until late January 2017. Tr. 248. Other examples of unfinished work were detailed at trial, but we need not discuss them further, as the work clearly was not substantially completed by the due date.

{¶ 71} As for MVCG's contention that Rick caused substantial delays that prevented MVCG's performance, the trial court, again, found Rick and Marci credible on all material issues. We have reviewed the testimony and find that the court's conclusion was reasonable. Accordingly, the trial court did not err in concluding that MVCG breached the terms of the construction contract.


IV. Recklessness

{¶ 72} MVCG's Second Assignment of Error states that:

The Trial Court Erred by Finding MVCG Acted Recklessly in Its Performance of the Contract.

**{¶ 73}** Under this assignment of error, MVCG contends that it did not act recklessly, but instead acted diligently in its performance, which was hampered by Rick's delays. Further, MVCG again argues that there was no evidence that Rick and Marick were desperate to open by the 2016 holiday season.

**{¶ 74}** The Supreme Court of Ohio has defined recklessness as follows:

Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. (2 Restatement of the Law 2d, Torts, Section 500 (1965), adopted.)

*Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, paragraph three of the syllabus.

**{¶ 75}** The court also noted in *Anderson* that "reckless conduct is characterized by a substantial and unjustifiable risk of harm to others and a conscious disregard of or indifference to the risk, but the actor does not desire harm." *Id.* at ¶ 34, citing Black's Law Dictionary 1298-1299 (8th Ed.2004). Thus, Rick did not have to prove that Jay desired to harm him or Marick.

**{¶ 76}** Applying these standards here, the trial court reasonably concluded that MVCG's conduct was both cavalier and reckless. As we have already said, Jay was aware of the pressing need to open the bar. He was aware that Rick's rent payments had been suspended for June, July, and August, based on the fact that the bar would

open in September. And he was also aware at the time of the change order that much work remained to allow the bar to open before the holidays.

{¶ 77} Notably, this was the only construction project that MVCG had at the time. MVCG had only one other project in 2016, which finished by the end of the first quarter. Tr. 270. In August 2016, when demolition was beginning, Jay took a vacation to Disneyland, but failed to either take plans for permits to the county or notify Rick that the plans needed to be filed. Rick found out later and had to take the plans to the county. Tr. 451-452.

{¶ 78} After the initial contract was signed, Rick and Marci showed up at the bar on many occasions, and no one was there working. Tr. 457. They repeatedly asked Jay where his people were, where he was, why the drywall was not going up, and why the project was not going forward. *Id.* Jay's response was that the bar would be open by October 17. Tr. 456. That did not occur, however.

{¶ 79} After the change order was signed, and knowing that he had only a month to complete the project, Jay took another vacation for 10 days, to spend Thanksgiving in Alabama. Tr. 457. Drywall had been delivered to the project by mid-November, but when Marci questioned Jay about it, he said that he had it under control and drywallers were coming. On the Tuesday before Thanksgiving, when Jay was getting ready to leave on vacation, Jay told Rick that he was meeting with the drywallers to explain what he wanted done. They were supposed to start Wednesday and work through Thanksgiving. However, when Rick went over Wednesday morning, no one was there, and neither Jay nor the person he left in charge during his absence responded to Rick's texts. Tr. 535-536.

{¶ 80} No one showed up on Thanksgiving Day, either, and Jay and Rick then had a heated conversation. Jay claimed the initial drywallers did not show up and stole tools. Tr. 536. Another group of drywallers was then hired from Craigslist, was unsupervised, and did poor work. After they were fired, yet another group was hired and began work on December 1. They were also fired after working for several days. Tr. 536-539 and 620. The next drywall person who was hired did not finish until around Christmas. Tr. 541.

{¶ 81} At a minimum, Jay's actions indicated complete indifference to the obvious risk that Rick and Marick would be harmed by MVCG's failure to perform the contract in a timely matter. Jay was aware well before signing the contract that opening the bar quickly was very significant, and he agreed to a time-frame that he then consciously disregarded by going on vacation and by failing to have competent personnel performing the work in his absence. Jay was also the sole owner and representative of MVCG, and his actions were binding on the company. *See Vienna Beauty Prods. Co. v. Cook*, 2015-Ohio-5017, 53 N.E.3d 808, ¶ 7 (2d Dist.) (holding that "[a]cts of an agent done within the discharge of her duties and within the scope of her authority, whether the authority is express, implied, or apparent, are binding on the principal").

{¶ 82} Based on the preceding discussion, the trial court did not err in concluding that MVCG acted recklessly with regard to its failure to substantially perform the work. Accordingly, MVCG's Second Assignment of Error is overruled.

## V. Award of Consequential Damages

{¶ 83} MVCG's Third Assignment of Error states as follows:

The Trial Court Erred by Awarding Consequential Damages and Consequential Damages Presented Were Wholly Speculative.

**{¶ 84}** Under this assignment of error, MVCG argues that consequential damages were not appropriate under Section XII of the contract, which prohibited such damages except for liability that arose from a person's willful or reckless actions. Since we have already addressed the issue of MVCG's recklessness, we need not consider this point further.

**{¶ 85}** MVCG additionally contends that Rick's lost profits were speculative and not recoverable. In this regard, MVCG asserts that the testimony of Rick's expert, Scott Hull, was based on flawed methodology because Hull looked at profit for years after the bar opened. MVCG also criticizes Hull's reliance on the stock market, local demographics, and local demand. Finally, MVCG disagrees with Hull's conclusion that Rick would not become a better bar owner (and therefore have greater profit) over a period of years, than over the first year of operation.

**{¶ 86}** The trial court awarded Marick $27,278 in consequential damages, based on Hull's testimony and Defendant's Ex. N (Hull's analysis of net profit Marick would have realized if the contract had not been breached). Judgment at p. 5. Before discussing MVCG's claims, we note that Hull was one of the witnesses the trial court found credible in all material respects. *Id.* at p. 2, fn.3.

**{¶ 87}** Generally, "lost profits may be recovered by the plaintiff in a breach of contract action if: profits were within the contemplation of the parties at the time the contract was made, the loss of profits is the probable result of the breach of contract, and the profits are not remote and speculative and may be shown with reasonable certainty."

*Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.*, 12 Ohio St.3d 241, 244, 466 N.E.2d 883 (1984). The Supreme Court of Ohio later explained that "in a breach of contract action, the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *City of Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65, 521 N.E.2d 814 (1988), syllabus (explaining the third prong set forth in *Charles R. Combs).*

{¶ 88} As noted, Rick and Marick presented testimony at trial from Scott Hull. Hull was the owner of a tax accounting service that did taxes and accounting for Mr. Boro's. Tr. 657 and 661. Besides being an accountant, Hull was well-experienced in the restaurant and bar business. Specifically, after graduating with an accounting degree in 1980, Hull worked as a controller for Sheraton Hotels, Westin Hotels, and Hilton Hotels between 1982 and 1993-1994. Tr. 656-659. These hotels had bars and restaurants within their premises, and as a controller, Hull handled the cash deposits, recorded sales and expenses, and created financial statements. Tr. 658

{¶ 89} Since 1994, Hull had operated Padgett Business Services, a franchised organization that specializes in servicing small retail businesses like restaurants and bars that are locally owned. Tr. 660-661. Prior to March 2017, Rick hired Hull, who provided tax and accounting services, as well as consulting services like cost analysis and what profit percentages should be so the bar could be successful. Tr. 661-662 and 676. Hull had done work for Mr. Boro's consistently for two-and-a-half years before he testified at trial. Tr. 676.

{¶ 90} For trial purposes, Hull calculated the net profit Mr. Boro's would have realized had the contract not been breached. That amount was $27,278. Tr. 668 and

Ex. N. In order to arrive at a figure, Hull compared the net profit from actual statements from December 2017 through March 2018, and reduced the March 2017 profit figure because Rick was open for half the month. Tr. 663, 665-667, and 668-669.

{¶ 91} We find no issue with the methodology used. Hull looked at actual expenses during comparative time periods and the profit generated. Furthermore, Hull also stated that economic circumstances had been very similar during the two years (essentially 2017 and 2018), and that, in fact, the monthly accounting figures for the entire two-and-a-half year span of the business had been "virtually identical." Tr. 677-678. According to Hull, the business profit was really good from the day the bar opened. Tr. 677.

{¶ 92} As to figuring in matters like the stock market, local demographics, and local market, there is no question that Hull had worked in the area for many years, was very experienced in finances and business consulting in the restaurant/bar area, and would have known what factors to take into consideration when evaluating profit. During trial, no evidence was presented to indicate that these factors were improper or that different factors should have been used.

{¶ 93} Regarding Rick's experience and the possibility that he would have done better in ensuing years, we note that the trial court questioned Hull at length on this point. Tr. 670-675. Rick's attorney also discussed this with Hull. According to Hull, the bar's performance from the beginning had been very consistent, was really good from "day one," and Rick's performance may have been only incrementally better later on. Tr. 672, 674, and 676-677. Consequently, we disagree that this factor was improperly considered.

{¶ 94} MVCG's final argument is that even if consequential damages were appropriate, the trial court should have prorated the amount to account for the fact that the contract expiration date was December 8 and the work was completed on February 22. The issue of when the bar was completed vis à vis damages was not raised during trial and therefore has been waived. *E.g., Orthopedic & Neurological Consultants, Inc. v. Cincinnati Ins. Co.*, 2018-Ohio-185, 104 N.E.3d 133, ¶ 11 (10th Dist.) (arguments not raised in the trial court are waived); *Wright-Patt Credit Union, Inc. v. Danes*, 2d Dist. Montgomery No. 26433, 2015-Ohio-2184, ¶ 9 (same).

{¶ 95} However, at trial, MVCG did raise the fact that the contract was to be performed by December 8, and Hull indicated he was unaware of that. Tr. 682. During redirect examination, Rick's counsel asked how Hull would account for that, and Hull said he would simply divide $12,017 (the lost profit for December 2016) by 31 and multiply that number by eight. Tr. 684-685. The trial court agreed with that analysis but did not reduce its judgment by that amount. Tr. 685. Instead, the court used the loss reflected in Defendant's Ex. N, which was the entire amount.

{¶ 96} We conclude this was error. The amount in question is $3,101.16. Consequently, the Third Assignment of Error will be overruled in part and sustained in part, and this matter will be remanded to the trial court for correction of the judgment in that amount.

## VI. Grit Marketing

{¶ 97} MVCG's final assignment of error states that:

The Trial Court Erred by Failing to Award Damages for Baarlaer's

and Marick's Usurpation of Grit Marketing's Work.

**{¶ 98}** Under this assignment of error, MVCG contends that the trial court erred in failing to award it damages for work done by Jay's sister, Shawna, who operated Grit Marketing. According to Jay, Shawna developed a menu and drinks that Mr. Boro's used, and MVCG, due to the assignment of the claim, was entitled to recover either $6,500 or $15,000 for Shawna's services, on the basis of quasi-contract.

**{¶ 99}** The trial court rejected this claim, concluding first that there was "no meeting of the minds between Baarlaer/Marick and Shana Bakhsi/Grit Marketing for services,"[5] and therefore, Jay/MVCG's claims based on an assignment were "of no moment." Judgment at p. 6. The court also rejected the claim for quantum meruit/unjust enrichment because "whatever Shana Bakhshi and Shana Bakhshi/Grit Marketing did, provided Baarlaer/Marick nothing of value." *Id*.

**{¶ 100}** Admittedly, there was no written contract here, and the appropriate remedy would be in quasi-contract, which is an implied contract used to avoid injustice. *Paugh & Farmer, Inc. v. Menorah Home for Jewish Aged*, 15 Ohio St.3d 44, 46, 472 N.E.2d 704 (1984). This theory "is a legal fiction that does not rest upon the intention of the parties, but rather on equitable principles in order to provide a remedy. The two remedies most often associated with quasi-contracts are restitution and quantum meruit. Each of these remedies presupposes some type of unjust enrichment of the opposing party." *Id*. "In contracts implied in law there is no meeting of the minds, but civil liability arises out of the obligation cast by law upon a person in receipt of benefits which he is not justly entitled

---

[5] Shawna Bakhshi's name was spelled as both Shawna and Shana in the trial court. We have used the spelling found in the trial transcript.

to retain and for which he may be made to respond to another in an action in the nature of assumpsit." *Legros v. Tarr*, 44 Ohio St.3d 1, 7, 540 N.E.2d 257 (1989).

{¶ 101} "Unjust enrichment occurs when a person 'has and retains money or benefits which in justice and equity belong to another.' " *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 20, quoting *Hummel v. Hummel,* 133 Ohio St. 520, 528, 14 N.E.2d 923 (1938). "A plaintiff seeking to recover under unjust enrichment or quantum meruit must establish that (1) the plaintiff conferred a benefit on the defendant, (2) the defendant knew of the benefit, and (3) it would be unjust to permit the defendant to retain the benefit without payment." *Meyer v. Chieffo*, 193 Ohio App.3d 51, 2011-Ohio-1670, 950 N.E.2d 1027, ¶ 37 (10th Dist.), citing *Maghie & Savage, Inc. v. P.J. Dick, Inc.*, 10th Franklin Dist. No. 08AP-487, 2009-Ohio-2164, ¶ 33. *Accord Schlaegel v. Howell*, 2015-Ohio-4296, 42 N.E.3d 771, ¶ 30 (2d Dist.).

{¶ 102} Before we address MVCG's arguments, we again note the trial court's emphasis on credibility. The court specifically found Marci and Rick credible on every material point, but did not similarly find Jay and Shawna credible.

{¶ 103} Notably, the evidence on which MVCG relies is taken primarily from the testimony of Jay and Shawna. The appropriate issue, therefore, is whether the court's factual findings were "supported by some competent, credible evidence going to the essential elements of the case." *Gold*, 166 Ohio App.3d 371, 2006-Ohio-943, 850 N.E.2d 1218, at ¶ 81. MVCG has not suggested that the trial court erred in applying the law of quasi-contract.

{¶ 104} After reviewing the evidence, we find ample evidence to support the trial court's conclusion. As indicated above, Marci had extensive experience in operating

neighborhood bars and bartending. Tr. 435 and 442. In her previous experience, she began as a bartender and then became a general manager, where she was in charge of bartending training, hiring, firing, ordering, day-to-day logistics, and creating the food menu. Tr. 435. Marci was also very experienced in food cost analysis, as she had done it while working at bars. In addition, when designing the bar, Marci learned a great deal while working with food representatives from Sysco. Tr. 439.

{¶ 105} In the summer of 2016, Marci made several trips to Sysco to work on cost analysis and food preparation. Sysco had a huge kitchen and had chefs that helped her design and create her concept. Tr. 448-449. By August or September 2016, Marci had completed the food and drink menu. She had some craft cocktails on the menu, but most people who come to neighborhood taverns drink craft beers and standard items like vodka and tonic. Tr. 452. According to Marci, thousands and thousands of drinks are in the public domain. Tr. 438. As of late February 2017, Marci had all her menu items ready to go, through working with Chef Jennifer from Sysco, who had been with her throughout the whole process. Tr. 468-470. She also worked with a food representative from Sysco who wrote all the things that were on the menu. Tr. 470.

{¶ 106} Jay mentioned to Marci and Rick that his sister, Shawna, was a bigwig in corporate restaurants and offered, as a favor, to have her look at what they had and go over some cost analysis. Marci told Jay that she appreciated it but was already done and did not want help. She also stressed that corporate restaurants are very different from neighborhood taverns. Tr. 471-472 and 489. Shawna had some suggestions, and Marci did talk with her and liked one drink that Shawna suggested. However, everything concerning food and drinks was in the public domain. Tr. 472, 475, and 489.

{¶ 107} Neither Marci nor Jay ever contacted Shawna initially or asked her to get involved in the project, nor did they ever discuss how much Shawna charged for her services.   They also did not tell Shawna that they agreed to pay her.   Tr. 471, 554, 557, 558, and 612.   At trial, Rick said he assumed that Jay got Shawna involved because Jay wanted them to succeed and to be able to pay back the promissory note.   Tr. 558-559. In addition, throughout the process, Jay had some interest, and more seriously toward the end, in wanting to be a partner.   Tr. 559.   The first time money was ever discussed was when Shawna offered to fly up for the opening, and Jay told them how much it would cost.   Tr. 558.   Rick and Marci turned down that offer, as they already had everything set up and were ready to go.   Tr. 474 and 558-559.

{¶ 108} In view of the above testimony, the trial court's rejection of the claim for Shawna's services was supported by competent, credible evidence.   According, MVCG's Fourth Assignment of Error is overruled.

## VI.   Conclusion

{¶ 109} Based on the preceding discussion, Jay Bakhshi's sole assignment of error is overruled, and MVCG's First, Second, and Fourth Assignments of Error are also overruled.   MVCG's Third Assignment of Error is overruled in part and is sustained in part, and this matter is remanded to the trial court for deduction of $3,101.16 from the amount awarded to Jay Bakhshi and MVCG.

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

Michael T. Columbus
Scott G. Oxley
Code Credit Union
Christine Kurilic
Michele Phipps
Hon. Steven K. Dankof